UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ANTHONY HORNE, | ) |
| | ) |
|        Plaintiff, | ) |
| | ) |
| vs. | )    Case No. 3:18-cv-126-GCS |
| | ) |
| CHRISTINE BROWN, | ) |
| | ) |
|        Defendant. | ) |

### MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

As narrowed by the Court's threshold order (Doc. 7), Plaintiff Anthony Horne alleges that Defendant Christine Brown, in her role as Healthcare Unit Administrator at Pinckneyville Correctional Center ("Pinckneyville"), was deliberately indifferent to his serious medical needs by ignoring vision treatment needs and delaying receipt of prescription eyeglasses. Now before the Court is Defendant's motion for summary judgment (Doc. 53). For the reasons delineated below, the Court denies Defendant's motion.

### FACTUAL BACKGROUND

At all times relevant to his complaint, Horne was an inmate in the custody of the Illinois Department of Corrections ("IDOC") incarcerated at Pinckneyville. Brown, a registered nurse, worked as the Healthcare Unit Administrator at Pinckneyville.

Horne arrived at Pinckneyville on October 31, 2016. (Doc. 53-1, p. 3). He has diabetes, asthma, and high blood pressure and, while at Pinckneyville, was treated in

separate clinics for each condition. (Doc. 53-1, p. 6). Horne first started wearing glasses for reading around 2000 while incarcerated in Cook County. (Doc. 53-1, p. 7). When he arrived at Pinckneyville, he started having issues with blurry vision. (Doc. 53-1, p. 8). According to his deposition testimony, he filled out a slip requesting to see an eye doctor because he started seeing floaters and getting headaches. (Doc. 53-1, p. 8). Horne did not receive a response to his request.

When he did not receive a response after a month, Horne claims that he submitted a second written request. He submitted his requests by dropping them into a medical request box. Horne testified that he did not receive responses to his vision-related requests and that he submitted additional requests roughly each month between November 2016 and April 2017. (Doc. 53-1, p. 16). He did not submit any request slips after April 2017. (Doc. 53-1, p. 17). Horne acknowledged that the request slips he submitted about food allergies received written responses from Brown, so it was possible she did not receive all of his vision-related request slips. (Doc. 53-1, p. 18).

Horne testified that he also spoke to Brown about his vision issues because medical staff, including two doctors, told him that she had to sign off for Horne to leave Pinckneyville on medical furlough. (Doc. 53-1, p. 19). Horne first spoke with Brown in November 2016. He asked her when she would have an optometrist available, and he claims that she told him that she was working on it. (Doc. 53-1, p. 20). Horne testified that he spoke with Brown approximately three weeks later, and she told him that the optometrist was on some sort of leave. (Doc. 53-1, p. 20). He then sent her a request about his food allergies and met with her to discuss them, but Horne did not ask her about the

optometrist during that conversation. (Doc. 53-1, p. 20). The last time Horne claims he spoke with Brown was in April 2017. (Doc. 53-1, p. 22).

On November 4, 2016, Horne was seen by healthcare staff for various treatments and tests and reported no complaints related to his vision to the nurses. (Doc. 53-2, p. 9-10). Medical records reflect visits between November 2016 and March 2017 without mention of vision issues to staff at Pinckneyville. (9-19). Horne, however, claims that he saw Dr. Scott on November 14, 2016 and that Dr. Scott put in a request for an optometrist appointment. (Doc. 53-1, p. 9). The medical records reflect that on November 14, 2016, Horne saw a nurse practitioner and discussed a cane that was missing after his transfer from the Cook County Jail. The records show no notes from Dr. Scott on that date nor is there anything related to Horne's vision. (Doc. 53-2, p. 11).

Horne filed a grievance related to his vision issues on April 15, 2017. (Doc. 53-3, p. 13). He complained that he had been trying to see an eye doctor for six months and that Dr. Scott put in the request for an appointment. Horne explained that without glasses, he was having trouble seeing. (Doc. 53-3, p. 13). A counselor responded to his grievance on July 13, 2017.  The counselor explained that the healthcare unit reviewed his file and referred him to the optometrist.  The counselor also indicated that Horne would see the optometrist at the next available opportunity and that he was scheduled to see a doctor at Pinckneyville about his vision issues. (Doc. 53-3, p. 13). Horne saw a doctor to discuss his issues on July 23, 2017. (Doc. 53-2, p. 21).

On July 27, 2017, Horne was formally approved to see an optometrist. (Doc. 53-2, p. 22). The appointment was scheduled for August 22, 2017. (Doc. 53-2, p. 22). Horne was

examined at Marion Eye Center, and he was diagnosed with mild macular dystrophy. He was told to monitor for signs or symptoms of changes, and he was referred to Dr. Omar Ahmad for a retinal consultation in three months. (Doc. 53-2, p. 37). Around this same time, Horne filed another grievance on August 16, 2017, in which he explained that he had been trying to obtain eyeglasses for a year. A counselor responded to the grievance on September 6, 2017.  The counselor explained that after he was seen by the optometrist on August 22nd, his prescription for glasses would be sent to Dixon Correctional Center to be made. (Doc. 53-3, p. 4).

A grievance officer reviewed the grievance on September 25, 2017, and found that "L. LaCrone DON indicated that the grievants [sic] medical record was reviewed. Per a review of the file he went out to see the optometrist at Marion Eye Center on 8/22/2017. His script for glasses will be sent to Dixon Correctional Industries to be made. Grievant will be given his glass when they are sent to PNK." (Doc. 53-3, p. 3). On October 4, 2017, Horne received a prescription for eyeglasses from a doctor at Pinckneyville. Because of an issue with the paperwork completed with Marion Eye Center, Horne did not receive his glasses until November 8, 2017. (Doc. 53-2, p. 46-47; Doc. 53-3, p. 11). Horne testified that medical staff told him that Brown was one of the people who had to sign off on him receiving the glasses, so he faults her for holding up the process. (Doc. 53-1, p. 23).

As to his retinal issues, a retinal consultation collegial request was approved on September 5, 2017, and Horne was seen by Dr. Ahmad on December 22, 2017. (Doc. 53-2, p. 40). Dr. Ahmad concluded that Horne had issues with retinal dystrophy, not macular

degeneration, and Dr. Ahmad explained to Horne that there were no good treatment options beyond periodic evaluation. (Doc. 53-2, p. 44).

Brown, by way of declaration, explains that, as the Healthcare Unit Administrator, it is her job to direct, coordinate, and review activities of healthcare operations in conjunction with the Medical Director and the Nursing Director. She does not treat patients regularly in her administrative role, and only doctors are able to order specific treatments for inmates, including referral to medical specialists. (Doc. 53-4). Brown does not remember Horne, but she acknowledges that she provided information to his counselor for grievance responses on two occasions. (Doc. 53-4). Horne's medical records indicate that the grievances Brown reviewed were dated September 22, 2017 and November 9, 2017. Laura LeCrone responded to the April 2017 and August 2017 grievances. (Doc. 53-2, p. 78, 80-82).

On January 22, 2018, Horne filed suit. Two claims survived threshold review. First, Horne alleges Brown acted with deliberate indifference to his serious medical needs relating to his macular dystrophy, claiming his condition will soon require surgery (Count I). Horne also alleges Brown was deliberately indifferent to his serious medical needs by delaying the receipt of his prescription eyeglasses (Count II).

## LEGAL STANDARDS

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See*

*Archdiocese of Milwaukee v. Doe,* 743 F.3d 1101, 1105 (7th Cir. 2014)(citing FED. R. CIV. PROC. 56(a)).  *Accord Anderson v. Donahoe,* 699 F.3d 989, 994 (7th Cir. 2012).  A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enterpr., Inc.,* 753 F.3d 676, 681-682 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *See Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

## II.     Eighth Amendment Deliberate Indifference

The Eighth Amendment prohibits cruel and unusual punishment, and the deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009). A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm"—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). A prisoner's dissatisfaction with a medical professional's prescribed course of treatment does not give rise to a successful deliberate indifference claim unless the treatment is so "blatantly inappropriate as to

evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)(citation omitted).

In order to prevail on a claim of deliberate indifference, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *See Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011)(citation omitted). The first consideration is whether the prisoner has an "objectively serious medical condition." *Arnett*, 658 F.3d at 750. Accord *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Hammond v. Rector*, 123 F. Supp. 3d 1076, 1084 (S.D. Ill. 2015)(citing *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir.2014)). It is not necessary for such a medical condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994)(violating the Eighth Amendment requires "deliberate indifference to a *substantial* risk of *serious* harm")(internal quotation marks omitted) (emphasis added).

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *See Greeno*, 414 F.3d at 653. The plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference.

*Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). *See also Hammond*, 123 F. Supp. 3d at 1086 (stating that "isolated occurrences of deficient medical treatment are generally insufficient to establish . . . deliberate indifference"). Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)(citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

## ANALYSIS

Brown does not contest that Horne's vision issues present an objectively serious medical need. Horne described having blurred vision and headaches and testified that he needed prescription eyeglasses to deal with his problems. Additionally, Horne was diagnosed with macular dystrophy, which requires monitoring and semi-annual dilation of his eyes. The Court finds that the record presents sufficient evidence that Horne's condition rises to the level of a serious medical need.

Brown argues that she cannot be held liable solely because as the Healthcare Unit Administrator, she was not responsible for providing him with medical care. She also argues there is no evidence that she had personal knowledge of a substantial risk to Horne. While Brown was not responsible for providing direct medical care to Horne, his testimony creates a question of fact as to whether Brown knew about Horne's vision issues. Horne testified that he submitted request slips, though it is unclear whether they reached Brown. That being said, Horne testified that he specifically addressed those request slips to Brown. (Doc. 53-1, p. 27). The undisputed facts also show that Brown did, in fact, respond to one of Horne's complaints about allergies. Thus, a reasonable

inference could be made that Brown was aware of Horne's complaints, and that she knowingly or recklessly disregarded those complaints by choosing to ignore them.

The doctrine of *respondeat superior* does not apply in § 1983 cases. *See Shields v. Illinois Dept. of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014)(citing *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)). Horne's allegations in this case, however, do not seek to impose liability on Brown solely because of her role as an administrator. Horne described multiple conversations with Brown about his desire to see an optometrist for his vision problems, which Horne claims Dr. Scott ordered. In at least one interaction, Horne claims that Brown told him she was working on it, but the record demonstrates that Horne was not scheduled for an optometrist appointment until July 2017. He wasn't seen until August 2017. A reasonable juror crediting Horne's testimony could find both that Brown was personally involved in the allegations in this action and that she was aware of Horne's vision problems as early as November 2016. Brown does not remember Horne and denies knowledge and personal involvement, but these disputes between the parties must be resolved by a trier of fact.

Brown also argues that Horne has not provided any verified medical evidence that he suffered a substantial harm due to the delay in his treatment. A delay in treatment can rise to the level of deliberate indifference if the delay "exacerbated the inmate's injury or unnecessarily prolonged his pain." *Perez v. Fenoglio*, 792 F.3d 768, 777-778 (7th Cir. 2015)(citing *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) and *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007)). "Whether the length of delay is tolerable depends upon the seriousness of the condition and the ease of providing

treatment." *Id.* (citing *McGowan*, 612 F.3d at 640). Where a plaintiff complains that treatment was delayed, as opposed to denied, the Seventh Circuit "require[s] that the plaintiff present 'verifying medical evidence' that the delay, and not the underlying condition, caused some harm." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019)(quoting *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013)(citing reference omitted)). Specifically, "'a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental[.]'" *Jackson*, 733 F.3d at 790 (quoting *Williams v. Liefer*, 491 F.3d 710, 714-715 (7th Cir. 2007)).

Horne's testimony and medical records reflect that he complained of very blurry vision and headaches behind both of his eyes for months. (*See, e.g.*, Doc. 53-2, p. 41). While there is insufficient evidence that any delay in treatment affected or worsened Horne's issues with macular dystrophy, there is a triable issue of fact as to whether a one-year delay in receiving eyeglasses caused him harm or unnecessarily prolonged his pain. Tied to this is the alleged delay in seeing an eye doctor to diagnose his eye issues, including his macular dystrophy. Horne testified that his problems improved after receiving eyeglasses and that he had more issues before he received them. (Doc. 53-1, p. 23). These facts suggest that there was substantial harm or prolonged pain caused by the delay in Horne's treatment.

Indeed, the facts in the instant case are analogous to the case of *Williams v. Liefer*, 491 F.3d 710 (7th Cir. 2007), which discussed what evidence could qualify as "verifying medical evidence." The Seventh Circuit noted that expert testimony would clearly satisfy the requirement of "verifying medical evidence" but "evidence of a plaintiff's diagnosis

and treatment, standing alone, [wa]s insufficient if it does not assist the jury in determining whether a delay exacerbated the plaintiff's condition or otherwise harmed him." *Id.* at 715. Although there was testimony from a medical expert that the delay in treatment did not appear to have affected the plaintiff's condition, there was evidence that the treatment the plaintiff received had an almost immediate effect on the pain and symptoms he was encountering. *Id.* As such, the Seventh Circuit concluded that a reasonable jury could have concluded that the six hour delay in treatment caused unnecessary pain and dangerously elevated blood pressure for no good reason. *Id.* at 716.

There also remains a question of fact as to whether Brown is responsible for the delay in Horne's vision treatment. To be held liable for delaying treatment, there must be evidence that a "defendant's actions or inaction caused the delay in his treatment." *Walker*, 940 F.3d at 964 (citing reference omitted). While Brown provided no direct medical treatment, her role as Healthcare Unit Administrator includes directing and coordinating healthcare operations, which seemingly includes ensuring access to necessary healthcare for prisoners. There is sufficient evidence before the Court to allow a reasonable juror to conclude that Brown was aware Horne needed to see an optometrist and was aware there was a delay in his treatment. Given the delay, a reasonable juror likewise could conclude that Brown acted with disregard for Horne's medical needs and his need to see an eye doctor.

Drawing inferences in favor of Horne as the non-moving party, there is insufficient evidence to allow the Court to conclude as a matter of law that Brown's inaction did not

contribute to the delay in Horne's optometrist appointment. Similarly, Horne testified that he was told Brown personally delayed the production of his eyeglasses, and an email provides some support for Horne's testimony. In response to a November grievance inquiry from someone reviewing it, Brown explained that Horne's prescription was not sent to Dixon until September 26, 2017, because Marion Eye Center did not complete the proper order form in August 2017. (Doc. 53-3, p. 11). Brown argues the delay is Marion's fault, but, as Horne points out, there is a question of fact as to whether Brown was derelict in her administrative duties of ensuring his access to treatment related to the paperwork mistake and the related delay. As such, the Court finds that issues of fact preclude the entry of summary judgment as to all claims brought by Horne.

Brown further argues that she is entitled to qualified immunity. Qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*. It protects an official from suit "when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

The qualified immunity test has two prongs: (1) whether the facts shown, taken in the light most favorable to the party asserting the injury, demonstrate that the officer's

conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *See Pearson*, 555 U.S. at 232. *See also Brosseau*, 543 U.S. at 197; *Wilson v. Layne*, 526 U.S. 603, 609 (1999). To be "'clearly established' a right must be defined so clearly that every reasonable official would have understood that what he was doing violated that right." *Dibble v. Quinn*, 793 F.3d 803, 808 (7th Cir. 2015)(citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). There need not be a case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The right must be established "not as a broad general proposition." *Reichle*, 566 U.S. at 664. Instead, it must be "particularized" such that the "contours" of it are clear to a reasonable official. *Id*. That is, "existing precedent must have placed the statutory or constitutional question beyond debate." *Carroll v. Carmen*, 135 S.Ct. 348, 350 (2014).

As discussed above, when the facts are taken in the light most favorable to Horne, Brown's conduct could be said to violate his constitutional rights. As such, she is not entitled to qualified immunity.

## Conclusion

For the above-stated reasons, Defendant Christine Brown's motion for summary judgment is **DENIED**. This case shall proceed to trial on both of Plaintiff Anthony Horne's claims.

**IT IS SO ORDERED.**

Dated: May 18, 2020.

Digitally signed by Judge Sison
Date: 2020.05.18 15:28:17 -05'00'

_____
GILBERT C. SISON
United States Magistrate Judge

**IT IS SO ORDERED.**

Dated:  May 18, 2020.

Digitally signed by Judge Sison
Date: 2020.05.18 15:28:17 -05'00'

_____
GILBERT C. SISON
United States Magistrate Judge